IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

DAVONNA HENDERSON,

    Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

    Defendant.

No. C15-2057

RULING ON JUDICIAL REVIEW

TABLE OF CONTENTS

*I.*    *INTRODUCTION* .................................. 2

*II.*   *PRINCIPLES OF REVIEW* .......................... 2

*III.*   *FACTS* ......................................... 4
    *A.*    *Henderson's Education and Employment Background* .......... 4
    *B.*    *Vocational Expert's Testimony from Administrative Hearing*
        *Held on November 26, 2013* ........................ 4
    *C.*    *Henderson's Medical History* ...................... 5

*IV.*   *CONCLUSIONS OF LAW* ............................ 8
    *A.*    *ALJ's Disability Determination* .................... 8
    *B.*    *Objections Raised By Claimant* ..................... 10

*V.*    *CONCLUSION* ................................... 19

*VI.*   *ORDER* ........................................ 19

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Davonna Henderson on July 14, 2015, requesting judicial review of the Social Security Commissioner's decision to deny her applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits.[1] Henderson asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits and SSI benefits. In the alternative, Henderson requests the Court to remand this matter for further proceedings.

## II. PRINCIPLES OF REVIEW

The Commissioner's final determination not to award disability insurance benefits following an administrative hearing is subject to judicial review. 42 U.S.C. § 405(g). The Court has the authority to "enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." *Id.* The Commissioner's final determination not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3).

The Court "'must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole.'" *Bernard v. Colvin*, 774 F.3d 482, 486 (8th Cir. 2014). Substantial evidence is defined as less than a preponderance of the evidence, but is relevant evidence a "'reasonable mind would find adequate to support the commissioner's conclusion.'" *Grable v. Colvin*, 770 F.3d 1196, 1201 (8th Cir. 2014). In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). "The findings of the

---

[1] On September 30, 2015, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." 42 U.S.C. § 405(g). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012)

In *Culbertson v. Shalala*, the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

30 F.3d 934, 939 (8th Cir. 1994). In *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). *See also Cline v. Colvin*, 771 F.3d 1098, 1102 (8th Cir. 2014) ("'As long as substantial evidence in the record supports the Commissioner's decision, [the court] may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently.' *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).").

## III. FACTS

### A. Henderson's Education and Employment Background

Henderson was born in 1964. She completed the tenth grade in high school, and later earned a GED. She also took several classes at Hawkeye Community College, but never earned a degree. In the past, Henderson worked as a fast food restaurant worker.

### B. Vocational Expert's Testimony from Administrative Hearing Held on November 26, 2013

At the administrative hearing, the ALJ provided vocational expert Melinda Stahr with a hypothetical for an individual who is limited to:

> lift[ing] 20 pounds occasionally, 10 pounds frequently. She can only occasionally balance, stoop, crouch, kneel, crawl, or climb. She would be limited to simple, routine, repetitive work. Superficial contact with the public. Regular pace.

(Administrative Record at 85.) The vocational expert testified that under such limitations, Henderson could not perform her past work, but could perform the following jobs: (1) small products assembler, (2) housekeeper, and (3) molding machine tender. The ALJ provided the vocational expert with a second hypothetical which was identical as the first, except that the individual "can only be on her feet two hours total during a work day. She would require two or more unscheduled breaks. . . . Those are additional breaks above and beyond the normal and they'd be 15 to 30 minutes."[2] The vocational expert testified that under such limitations, Henderson would be precluded from competitive employment.

Henderson's attorney also questioned the vocational expert. Henderson's attorney inquired:

> Q: Okay, and if the person were limited to light work, but were unable to, were limited to only occasional fine and gross manipulation, would they be able to do those jobs you listed?

---

[2] Administrative Record at 86.

4

A:   They would not. They all require at least frequent [fine and gross manipulation]. . . .

Q:   If the, if we keep hypothetical one and indicated that she would have to alternate between sitting and standing at will at least, and have two unscheduled breaks of even just 10 minutes where she would have to walk around. Would that preclude the jobs that you listed.

A:   It's my opinion that that would preclude those light jobs there [(sic)] were listed in hypothetical number one.

(Administrative Record at 87-88.)

### C. Henderson's Medical History

On January 4, 2011, Henderson was referred by Disability Determination Services ("DDS") to Dr. Paul M. Conditt, Psy.D., for a psychodiagnostic disability examination. In discussing her reasons for seeking disability, Henderson stated "'[m]ostly day-to-day thinking. I can't hold an 8-hour job.'"[3] In further elaborating on her "thinking" problems, Dr. Conditt noted Henderson will:

> start talking and lose her train of thought before she finishes a sentence. She has struggled with depression for much of her life, but it has worsened since last July 4, when her son was stabbed to death by his girlfriend. Since then, she has heard voices at night and thinks she sees him on occasion.

(Administrative Record at 587.) In considering her current mental health functioning, Dr. Conditt found:

> [Henderson] has struggled with depression on and off for much of her adult life, but it has gotten much worse since her son was murdered and she now is experiencing some psychotic features. At night, she'll wake up and hear voices and a couple of times, believes she saw [her son.] She is very irritable, saying "I snap on people easy." This occurs 2-3 times every day. She also has nightmares about her son's death and sleep is very disturbed, even with taking Trazadone. She complained about getting frustrated very easily[.] . . .

---

[3] *Id.* at 587.

5

> Her concentration is poor, saying that her mind wanders a lot. "Sometimes I feel like I'm just here. My mind wanders, I'm confused, and I lose track of where I'm going. My mind is just scrambling and that makes me angry." In addition, her back pain "makes me irritable. I can't take pain."

(Administrative Record at 588.) Dr. Conditt concluded that Henderson operates cognitively in the low average to borderline range. She did not have any problems with her memory tests, and Dr. Conditt opined that her memory problems "seem to be due more to her mood than a cognitive problem."[4] Dr. Conditt diagnosed Henderson with major depressive disorder with psychotic features, back pain, shoulder pain, severe headaches, and obesity. Dr. Conditt assigned her a GAF score of 56. Dr. Conditt opined that Henderson's prognosis is guarded. Dr. Conditt addressed Henderson's functional abilities as follows: (1) slight impairment in the ability to understand instructions, procedures, and locations; (2) limited pace due to back pain; (3) poor concentration due to depression; (4) slight impairment with the ability to interact appropriately with supervisors, co-workers, and the public, and (5) a long history of using poor judgment when taking crack cocaine.

On September 17, 2012, Dr. Aaron Quinn, Ph.D., reviewed Henderson's medical records and provided DDS with a Psychiatric Review Technique and mental residual functional capacity ("RFC") assessment for Henderson. On the Psychiatric Review Technique assessment, Dr. Quinn diagnosed Henderson with major depressive disorder with psychotic symptoms. Dr. Quinn determined Henderson had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Quinn determined Henderson was moderately limited in her ability to: carry out detailed instructions, maintain attention and concentration for

---

[4] Administrative Record at 588-89.

extended periods, complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes. Dr. Quinn concluded Henderson "is able to complete at least simple, repetitive tasks in a sustained manner. . . . [S]he will have difficulties at times with sustaining attention/concentration, following detailed instructions, maintaining pace, interpersonal functioning, and judgment."[5]

On November 9, 2012, Dr. Scott Shafer, Ph.D., reviewed Henderson's medical records and provided DDS with a Psychiatric Review Technique and mental RFC assessment for Henderson. On the Psychiatric Review Technique assessment, Dr. Shafer diagnosed Henderson with major depressive disorder with psychotic symptoms and anxiety disorder. Dr. Shafer determined Henderson had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Shafer determined Henderson was moderately limited in her ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes. In conclusion, Dr. Shafer "affirmed" Dr. Quinn's assessment as written.

On December 9, 2013, at the request of Henderson's attorney, Vicki Boling, ARNP, a treating source, filled out "Mental Impairment Interrogatories" for Henderson. Boling diagnosed Henderson with bipolar disorder and panic disorder. Boling noted the following signs and symptoms for Henderson: sleep disturbance, mood disturbance,

---

[5] Administrative Record at 104-105.

7

emotional lability, delusions and hallucinations, recurrent panic attacks, loss of interests, feelings of guilt and worthlessness, difficulty thinking or concentrating, social withdrawal and isolation, decreased energy, and generalized anxiety disorder. Boling also indicated Henderson's medications cause her fatigue. Boling opined Henderson's prognosis is "fair." Boling estimated Henderson would miss three or more days of work per month due to her impairments or treatment for her impairments. Boling determined Henderson was markedly limited in her ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods of time, perform activities within a schedule, complete a normal workday, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting. Boling also determined Henderson had an extreme limitation in the ability to complete a normal workweek. Overall, Boling determined Henderson had the following limitations: moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and frequent deficiencies in maintaining concentration, persistence, or pace.

## IV. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined Henderson is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Moore v. Colvin*, 769 F.3d 987, 988 (8th Cir. 2014). The five steps an ALJ must consider are:

> (1) whether the claimant is currently employed; (2) whether the claimant is severely impaired; (3) whether the impairment is or approximates an impairment listed in Appendix 1; (4) whether the claimant can perform past relevant work; and, if not, (5) whether the claimant can perform any other kind of work.

*Hill v. Colvin*, 753 F.3d 798, 800 (8th Cir. 2014); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "'bears the burden of demonstrating an inability to return to [his] or her past relevant work.'" *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "'the claimant has the physical residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with [his or] her impairments and vocational factors such as age, education, and work experience.'" *Phillips v. Astrue*, 671 F.3d 699, 702 (8th Cir. 2012). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a)(1); *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014). The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an

individual's own description of [his or] her limitations.'" *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined Henderson had not engaged in substantial gainful activity since January 1, 2010. At the second step, the ALJ concluded from the medical evidence Henderson had the following severe impairments: left knee arthritis, degenerative disc disease, obesity, and depression. At the third step, the ALJ found Henderson did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Henderson's RFC as follows:

> [Henderson] has the residual functional capacity to perform light work . . . except: She can occasionally balance, stoop, kneel, crouch and climb. She is limited to simple routine, repetitive type work performed at a regular pace.

(Administrative Record at 44.) Also at the fourth step, the ALJ determined Henderson is unable to perform her past relevant work. At the fifth step, the ALJ determined that based on her age, education, previous work experience, and RFC, Henderson could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded Henderson was not disabled.

### B. Objections Raised By Claimant

Henderson argues the ALJ's RFC assessment is flawed. Specifically, Harvey argues the ALJ's RFC assessment is incomplete because it does not properly account for all of her impairments and functional limitations, in particular her difficulties with mental functioning and social functioning. Henderson also argues the ALJ's RFC assessment is not supported by substantial evidence in the record. Specifically, Henderson asserts the ALJ failed to properly evaluate the medical opinion evidence in the record, which supports a finding of mental functioning and social functioning limitations. Henderson maintains this matter should be remanded for a new RFC determination based on a fully and fairly developed record.

When an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley*, 152 F.3d at 1059. The ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson*, 361 F.3d at 1070). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey*, 503 F.3d at 697 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

An ALJ also has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

An ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. § 404.1527(c). If the medical opinion is not from a treating source,

then the ALJ considers the following factors for determining the weight to be given to the non-treating medical opinion: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese v. Astrue*, 552 F.3d 728, 731 (8th Cir. 2008). "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).

Finally, in considering the opinions of Vicki Boling, ARNP, the Court must apply the principles set forth in the Social Security Regulations for a treating source that is not classified as an "acceptable medical source." Even though Boling is not an "acceptable medical source," the Social Security Administration ("SSA") requires an ALJ to consider such opinions in making a final disability determination. On August 9, 2006, the SSA issued Social Security Ruling 06-03p. The purpose of Ruling 06-03p was to clarify how the SSA considers opinions from sources not classified as "acceptable medical sources." *See Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (discussing SSR 06-03p). Ruling 06-03p provides that when considering the opinion of a source that is classified as a "not acceptable medical source," such as a counselor, "it would be appropriate to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion." SSR 06-03p. Furthermore, in discussing SSR 06-03p, the Eighth Circuit Court of Appeals, in *Sloan*, pointed out:

> Information from these 'other sources' cannot establish the existence of a medically determinable impairment, according to SSR 06-3p. Instead, there must be evidence from an 'acceptable medical source' for this purpose. However,

> information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.

*Sloan*, 499 F.3d at 888 (quoting SSR 06-03p). In determining the weight afforded to "other medical evidence," an "ALJ has more discretion and is permitted to consider any inconsistencies found within the record." *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) (citation omitted).

The Court will first address the ALJ's consideration of the medical opinion evidence in the record. The ALJ thoroughly reviewed and addressed the opinions of Vicki Boling, ARNP, Henderson's treating nurse practitioner. Specifically, the ALJ addressed Boling's treatment and opinions as follows:

> In July 2012, [Henderson] sought psychiatric care at Black Hawk Grundy Mental Health Center, reporting depression, grief, poor focus[,] panic symptoms, and irritability. . . . Her treating nurse practitioner Vicki Boling, ARNP, diagnose[d Henderson] with bipolar disorder, panic disorder, alcohol abuse, (based on consuming two beers at a time several times a month) and cocaine abuse in remission, with a GAF of 50 to 55. With an aggressive medication regimen, including antidepressants and antipsychotic medications, [Henderson] improved at the next two months' visits and displayed normal mental status. In October, she had some increased voices and her medications were adjusted. She saw counselor monthly from August to October 2012 (Exhibits 10F and 11F). Through November 2013, she continued to see the nurse practitioner for medication visits once every 1 to 3 months. She saw the counselor once a month as well; her GAF scores were generally around 50. She reported some stressors during the first half of 2013, but her mental status was still fairly good and remain[ed] stable. She reported a decrease in her mild psychosis. (Exhibit 13F).
>
> Her care providers encouraged her to work and she was looking for work in January 2013, with a referral to vocational

rehabilitation [in] March 2013 (Exhibit 13F/27, 28). In March and April 2013, she reported that her daughter was pregnant with twins and in the hospital on bed rest, so she was taking care of her daughters' [sic] young child. She also reported an interest in attending community college to get her certified nurse's aide license (Exhibit 13F/54, 58). In May 2013, she reported her sister had recently died and that [she] had been taking care of her prior to her death (Exhibit 13F/50). In July 2013, she announced a plan to start an overnight childcare business and stated she had attended school previously for childcare. She began to watch her daughter's three children and was continuing to watch the children overnight through at least November 14, 2013 (Exhibit 13F/6, 9, 17, 32, 36, 37, 39, 43). . . . Her counselor again encouraged her to follow up with vocational rehabilitation (Exhibit 13F/6). Such evidence conflicts with [Henderson's] allegations that she only watches the babies occasionally for 2 to 3 hours at a time. Additionally, her ability to take care of three children for several months at a time, as well as care for her ailing sister, is consistent with the ability to meet the demands of competitive work both physically and mentally.

However, [Henderson's] psychiatric nurse practitioner, Ms. Boling, completed a December 9, 2013 Medical Source Statement, and . . . she suggested that [Henderson] had moderate restrictions of activities of daily living and moderate difficulties in maintaining social functioning, with frequent deficiencies of concentration[,] persistence and pace[, and] three or more episodes of deterioration. Episodes of deterioration are defined under the Social Security Regulations as inpatient hospitalizations or similar events, so the evidence does not support this rating. The nurse practitioner also suggested that [Henderson] had marked limitations in her ability to perform activities within a schedule, complete a normal workday, complete a normal workweek (extreme limitation), accept instructions/respond appropriately in the workplace, and respond to changes in the workplace, with likely absences more than three days a month. This is inconsistent with the reports from Ms. Boling's treatment notes, showing stabilization of her bipolar disorder on a

> medication regimen, with GAF scores maintained above 50. It is also highly inconsistent with the reports of both the nurse practitioner and the counselor, who encouraged [Henderson] to work, report several months of home based babysitting with no apparent problems. They note few episodes of mood disturbance and [Henderson] was able to weather several stressful events, including the death of her sister, the hospitalization of her daughter, and her significant involvement in caring for her grandchildren, two of whom were premature infants. Ms. Boling expressed no concern about [Henderson's] ability to be alone with children for several hours each day or in her ability to exercise appropriate judgment. Therefore, considered under SSR 06-03p, the opinion statement from the treating nurse practitioner must be accorded little weight, as it is not supported by objective signs and findings, [Henderson's] actual activities of daily living, the nature of [her] psychiatric care or [her] ability to perform work activity.

(Administrative Record at 48-49.)

Having reviewed the entire record, the Court finds that the ALJ properly considered Boling's opinions in accordance with SSR 06-03p. Furthermore, the ALJ properly articulated his reasons for finding Boling's opinions to be "accorded little weight," and for finding her opinions to be inconsistent with the record as a whole. *See Raney*, 396 F.3d at 1010 (Providing that in considering the opinions of a medical source that is not an "acceptable medical source," an "ALJ has more discretion and is permitted to consider any inconsistencies found within the record."); *see also Sloan*, 499 F.3d at 889 (providing that a factor to consider in weighing evidence from a medical source that is not an "acceptable medical source" is the consistency of such as source's opinions with the record as a whole). Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

The ALJ also thoroughly addressed the opinions of Dr. Conditt, an examining psychologist. Specifically, the ALJ addressed Dr. Conditt's opinions as follows:

> In January 2011, [Henderson] was seen by psychologist Paul Conditt, Psy.D., for a consultative examination. [Henderson] reported a history of cocaine abuse, but that she was sober for two years. Upon examination, she reported grief due to the death of her son the previous summer and allege[d] sometimes hearing his voice. She had flat, irritable, frustrated affect, but her memory was intact. The psychologist diagnosed [Henderson] with major depressive disorder, with a GAF of 56. He concluded that [Henderson] has only slight impairment [in] her ability to understand instructions, procedures and locations, due to low education. He rated her concentration is poor, but stated that she had [not] made any serious mistakes at work and had only slight impairment in her ability to interact with others in the workplace (Exhibit 6F). This opinion is given some weight, but the suggestion that [Henderson] has poor concentration and poor judgment is inconsistent with the medical records as a whole, which shows no more than moderate limitations in these areas.

(Administrative Record at 47-48.) The ALJ also addressed the opinions of the State Agency non-examining consultative psychologists, Drs. Quinn and Shafer. The ALJ addressed Dr. Quinn's and Dr. Shafer's opinions as follows:

> [Henderson] has also been diagnosed with mental impairments. Significant weight is given to the 2012 opinions of the state agency psychological consultants, who concluded that [Henderson] had mild restriction of activities of daily living, moderate limitations in social functioning and moderate limitations in concentration, persistence and pace. They concluded that [Henderson] has the capacity to complete simple repetitive tasks in a sustained manner and exhibits the ability to get along well with treating and examining sources (Exhibits 5A, 6A, 9A, and 10A).

(Administrative Record at 47.)

Having reviewed the entire record, the Court finds that the ALJ properly considered and weighed the medical opinion evidence from Drs. Conditt, Quinn, and Shafer. The Court also finds that the ALJ provided "good reasons" for the weight he assigned the

16

various medical opinions. *See* 20 C.F.R. § 404.1527(c)(2); *Strongson*, 361 F.3d at 1070; *Edwards*, 314 F.3d at 967. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

Turning to the ALJ's overall RFC assessment for Henderson, as discussed in detail above, the ALJ thoroughly addressed and considered Henderson's medical history and treatment for her complaints in determining her RFC.[6] The ALJ also properly considered and thoroughly discussed Henderson's subjective allegations of disability in making his overall disability determination, including determining Harvey's RFC.[7]

More specifically, with regard to Henderson's social functioning, the ALJ followed the opinions of Dr. Conditt (Henderson having only slight impairment in her ability to interact with others in the workplace), and the State Agency psychologists (Henderson exhibiting the ability to get along well with treating and examining sources), and determined Henderson had "moderate" difficulties with social functioning. In addition to the opinions of Drs. Conditt, Quinn, and Shafer, the ALJ based his determination on the following information:

> [Henderson] reports socially isolating and difficulty getting along with others, but lives with a roommate and his teenage daughter, previously (or possibly currently) lived or lives with a boyfriend, and is able to spend a significant amount of time caring for young children. The medical evidence suggests that she related well to the examining and treating practitioners (Hearing Testimony and Exhibits 14E and 15E; Exhibit 10F, 11F and 13F).

---

[6] *See* Administrative Record at 45-50 (providing a thorough discussion of Henderson's overall medical history and treatment).

[7] *See* Administrative Record at 45-50 (providing a thorough discussion of Henderson's subjective allegations of disability).

(Administrative Record at 44.) Accordingly, the Court finds the ALJ properly addressed Henderson's social functioning in determining her RFC. *Guilliams*, 393 F.3d at 803.

The ALJ also adequately addressed Henderson's mental functioning, including her alleged difficulties with memory, concentration, and pace, by limiting Henderson to "simple routine, repetitive type work performed at a regular pace."[8] In *Brachtel v. Apfel*, a claimant was found to "often" have deficiencies of concentration, persistence, or pace. 132 F.3d 417, 421 (8th Cir. 1997). The ALJ's RFC assessment in *Brachtel*, provided that the claimant had the ability "'to do only simple routine repetitive work, which does not require close attention to detail.'" *Id.* (quotation omitted). Upon review, the Eighth Circuit Court of Appeals determined the limitations requiring the claimant to only do "'simple routine repetitive work, which does not require close attention to detail[,]'" properly accounted for the claimant's deficiencies in concentration, persistence, and pace in the ALJ's RFC assessment. *Id.*; *see also Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001) (finding the ability to do simple, repetitive, routine tasks adequately captures a claimant's deficiencies in concentration, persistence, or pace). Accordingly, in this case, the Court finds the ALJ's RFC determination that Henderson is able to do "simple routine, repetitive type work performed at a regular pace" adequately accounts for Henderson's deficiencies in memory, concentration, and pace.[9] *See Howard*, 255 F.3d at 582; *Brachtel*, 132 F.3d at 421.

Therefore, having reviewed the entire record, the Court finds that the ALJ properly considered Henderson's medical records, observations of treating physicians, and Henderson's own description of her limitations in making the ALJ's RFC assessment for

---

[8] *Id.* at 44.

[9] *See* Administrative Record at 44.

Henderson.[10] *See Lacroix*, 465 F.3d at 887. The ALJ also adequately addressed Henderson's mental functioning and social functioning in making his RFC determination for Henderson. *See Guilliams*, 393 F.3d at 803. Furthermore, the Court finds that the ALJ's decision is based on a fully and fairly developed record. *See Cox*, 495 F.3d at 618. Because the ALJ considered the medical evidence as a whole, the Court concludes that the ALJ made a proper RFC determination based on a fully and fairly developed record. *See Guilliams*, 393 F.3d at 803; *Cox*, 495 F.3d at 618. The Court concludes Henderson's assertion that the ALJ's RFC assessment is flawed is without merit.

## V. CONCLUSION

The Court finds the ALJ properly considered and weighed the medical opinion evidence in the record. The Court also finds the ALJ considered the medical evidence as a whole, and made a proper RFC determination based on a fully and fairly developed record. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VI. ORDER

1. The final decision of the Commissioner of Social Security is **AFFIRMED**;
2. Plaintiff's Complaint (docket number 3) is **DISMISSED** with prejudice; and
3. The Clerk of Court is directed to enter judgment accordingly.

DATED this 17th day of May, 2016.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA

---

[10] *Id.* (providing thorough discussion of the relevant evidence for making a proper RFC determination).